# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 01-2495

DERSCH ENERGIES, INC.,

*Plaintiff-Appellant*,

v.

SHELL OIL COMPANY AND EQUILON ENTERPRISES, INC.,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Southern District of Illinois.
No. 99 C 4217—**J. Phil Gilbert**, *Judge.*

———————

ARGUED NOVEMBER 30, 2001—DECIDED DECEMBER 26, 2002

———————

Before FLAUM, *Chief Judge*, and CUDAHY and MANION, *Circuit Judges.*

MANION, *Circuit Judge.*    Dersch Energies, Inc. purchases Shell Oil Company products and resells them to retail distributors. In December 1997, Dersch began negotiating with Shell the renewal of their franchise relationship, which was set to expire in the fall of 1998. Throughout the negotiation process, Dersch expressed concerns to Shell about several contract provisions that it deemed objectionable. After ten months of negotiations, Shell (now operating as Equilon Enterprises, L.L.C. due to a merger) informed Dersch that unless it signed the proposed franchise

agreement within the next few days, Shell/Equilon would issue a formal notice of nonrenewal of the parties' franchise relationship. Dersch signed the new franchise agreement "under protest," and, approximately one year later, filed an action for declaratory relief against Shell and Equilon, seeking a declaration of the corporation's rights under the agreement pursuant to the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801-2806. After some procedural wrangling, the parties filed cross-motions for summary judgment. The district court granted the defendants' motion, and Dersch filed a timely motion to alter or amend the judgment, which the court denied. Dersch appeals the district court's decisions granting the defendants' motion for summary judgment and denying its motions for summary judgment and to alter or amend the judgment. We affirm.

## I.

Dersch Energies, Inc. ("Dersch") is a family-owned motor fuel reselling business that has purchased and sold Shell-branded motor fuels for over fifty years. In its role as middleman, Dersch sells Shell-branded motor fuels in portions of southeastern Illinois and southwestern Indiana. On average, Dersch purchases over ten million gallons of Shell-branded motor fuels annually, which it then sells to service stations and other agricultural, commercial, and industrial businesses. Since 1951, Dersch has purchased motor fuels from Shell Oil Co. ("Shell") pursuant to a series of supply or "jobber" contracts (drafted by Shell), the last of which became effective on January 1, 1982, and was to remain in effect until December 31, 1984 ("1982 Contract"). The 1982 Contract provided for year-to-year renewals at the expiration of the initial three-year term, unless terminated by either party within ninety days of the annual renewal date. The parties operated under these annual re-

newals until September 1998, when a new franchise agreement was entered into by the parties.

In 1997, to ensure national uniformity, Shell decided to revise its existing franchise agreements with jobbers and wholesalers.[1] In December 1997, Shell sent a new franchise agreement ("Renewal Agreement") for Dersch to sign. In the accompanying correspondence, Shell highlighted the differences between the Renewal Agreement and the 1982 Contract, and informed Dersch that the 1982 Contract was set to expire on March 31, 1998. Shell also advised Dersch that it had until December 22, 1997, to execute the Renewal Agreement.

On February 25, 1998, Ken Zumdome, Shell's area manager for Dersch's territory, sent a facsimile message to John Dersch, Dersch's president, and Thomas Dersch, John Dersch's son and Dersch's vice president, advising them that a "[n]ew jobber contract was sent to you before Christmas. You are the only jobber who has not returned [the contract]. Every jobber in the country has this new contract in effect. Please return ASAP." On March 4, 1998, John Dersch responded by advising Shell, in writing, that the 1982 Contract was not set to expire until December 1998. On May 29, 1998, Shell notified Dersch that "Shell wants all jobbers on their new contract. You are the only jobber not signed. Our legal [department] says you have the right to

---

[1] According to the defendants, "uniform contracts are important to put all jobbers in a similar position so as to prevent jobbers from gaining an unfair advantage over other jobbers which could result if the terms and conditions of each individual contract were separately negotiated." The defendants also believe that "the presence of different terms between various jobbers/wholesalers might subject [them] to claims of selective application and discriminatory practices."

hold off signing until . . . December 31, 1998. If you do not return the contract prior to that, your contract with Shell will terminate."

On July 15, 1998, representatives from both parties met to discuss the terms and conditions of the proposed Renewal Agreement. During the course of the meeting, Thomas Dersch voiced concerns over the Renewal Agreement's: (1) indemnification provisions; (2) release of claims provisions; (3) assignment provisions; (4) pricing provision; and (5) description of Dersch's new defined territory. He also told the Shell representatives that he considered the corresponding security and personal guaranty agreements—that Shell was seeking to require Dersch to execute in conjunction with the Renewal Agreement—to be "onerous." Two days after the meeting, Dersch received a facsimile from Zumdome advising that Shell would not require Dersch to execute the new security or personal guaranty agreements, but noting that the Renewal Agreement would now require an addendum reflecting the fact that Shell had joined with Texaco, Inc. ("Texaco") to form Equilon Enterprises, L.L.C. ("Equilon") and acknowledging that Equilon would be Dersch's new supplier-franchisor under the Renewal Agreement.[2]

In mid-August 1998, Dersch received a slightly revised version of the Renewal Agreement from Shell, along with a letter that, after mistakenly asserting that the 1982 Contract had expired on August 3, 1998, advised Dersch that "the appropriate documents must be executed and re-

---

[2]  As part of a joint venture agreement between Shell and Texaco, certain assets of the companies were transferred to Equilon, effective July 1, 1998, including Dersch's franchise agreement with Shell. Equilon operates as a major oil company refiner and marketer of both Shell- and Texaco-branded motor fuels.

turned to Shell not later than August 3, 1998." According to Dersch, it did not respond to this letter because it believed, based on Shell's prior correspondence, that it had until December 31, 1998, to execute the Renewal Agreement.

On or about September 29, 1998, John Dersch received a telephone call from Zumdome, informing him that if Dersch did not sign and forward the Renewal Agreement to Shell/Equilon in the next two to three days, he was under instructions to issue an official notice of nonrenewal of Dersch's franchise relationship on October 1, 1998, to be effective January 1, 1999.[3] Zumdome advised Dersch that the nonrenewal would not be rescinded, and read excerpts from the notice that had already been prepared by the companies' attorneys. Thomas Dersch then requested that Zumdome send him a copy of the proposed notice of nonrenewal via facsimile. Zumdome complied with this request, faxing Dersch a copy of the proposed notice that same day. After reviewing the proposed notice of nonrenewal, Dersch executed the Renewal Agreement "under protest," and typed the following underneath each of his signatures or initials: "[d]espite my objections to this agreement, I have been threatened with the loss of my franchise if I do not sign it at this time. Accordingly, I am signing it under protest and reserve all rights to challenge it." Equilon signed the Renewal Agreement the next day on September 30, 1998.

---

[3] This was presumably to comport with the ninety-day notice requirement under the 1982 Contract and 15 U.S.C. § 2804's general rule that ninety days notice be given before a franchisor terminates a franchise or nonrenews a franchise relationship. *See, e.g., Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1217 (7th Cir. 1982).

On September 21, 1999, after operating under the Renewal Agreement for almost one year, Dersch filed an action for declaratory relief, pursuant to 15 U.S.C. § 2805(e) and 28 U.S.C. § 2201, requesting a declaration of its rights under the Renewal Agreement pursuant to the Petroleum Marketing Practices Act ("PMPA"). Specifically, Dersch sought a declaration that Shell and Equilon (collectively "Equilon" or the defendants) violated 15 U.S.C. § 2805(f)(1) by conditioning the renewal of the parties' franchise relationship on Dersch releasing claims and waiving rights that it had under both federal and state law.

In its complaint, Dersch alleged that the defendants, by threatening to discontinue the parties' franchise relationship, forced it to release or waive six state law rights, three of which are at issue on appeal. First, Dersch claimed that the indemnity provision of the Renewal Agreement, i.e., Article 11.1, required it to waive its right to contribution from joint tortfeasors in violation of 735 ILCS § 5/2-1117(a).[4] Second, Dersch averred that the change of delivery provisions, i.e., Articles 5.1 and 5.4, violated Ind. Code § 23-2-2.7-1(3) because they allowed the defendants to "change the delivery point for product sold to Dersch from the point of origin (i.e., the fuel terminal) to the destination, and back, at its option."[5] Third, Dersch maintained that the

---

[4]  735 ILCS § 5/2-1117(a) provides that "a defendant is severally liable only and is liable only for that proportion of recoverable economic and non-economic damages, if any, that the amount of that defendant's fault, if any, bears to the aggregate amount of fault of all other tortfeasors . . . ."

[5]  Ind. Code § 23-2-2.7-1(3) provides that "[i]t is unlawful for any franchise agreement entered into between any franchisor and a franchisee who is either a resident of Indiana or a nonresident
(continued...)

joint and several liability provision and the personal obligations and provisions clause, i.e., Articles 21.2 and 21.3 respectively, subverted the limitations on personal liability for corporate officers and directors under both the laws of Illinois and Indiana. *See, e.g., Davis v. Hass & Hass, Inc.*, 694 N.E.2d 588, 590 (Ill. App. Ct. 1998) (holding that "[a] corporation is a legal entity which exists separate and distinct from its shareholders, directors and officers. Accordingly, shareholders, directors and officers are generally not liable for a corporation's obligations.") (internal citations omitted); *State of Indiana, Civil Rights Comm'n v. County Line Park, Inc.*, 718 N.E.2d 768, 772 (Ind. Ct. App. 1999) (same). These contract provisions will hereinafter be referred to collectively as the "Disputed Provisions."

On December 9, 1999, the defendants moved to dismiss Dersch's complaint, arguing that there was no actual, justiciable controversy that would permit the district court to exercise subject matter jurisdiction, and claiming that the litigation was not ripe because Dersch's complaint only raised potential, not actual, violations of § 2805(f)(1). As such, the defendants asserted that the district court was being asked to improperly render an advisory opinion. The district court denied the defendants' motion to dismiss, concluding that Dersch's complaint alleged an actual controversy because "a fair reading of the complaint reveals that the controversy involves the question of whether Shell/Equilon's conduct of conditioning the franchise renewal on Dersch's assent to the waiver of rights provi-

---

[5] (...continued)
who will be operating a franchise in Indiana to contain [a provision] . . . [a]llowing substantial modification of the franchise agreement by the franchisor without the consent in writing of the franchisee."

sion violated [the PMPA]." In ruling on the defendants'
motion to dismiss, the district court also noted that
Dersch's complaint was "not proceeding on diversity
grounds" and that:

> To the extent that Dersch is relying on § 2805(f)(1) as an
> independent source of jurisdiction, Dersch's reliance is
> misplaced. Section 2805(f)(1) does not provide an inde-
> pendent basis for relief. Instead, § 2805(a) is the PMPA
> section that grants a district court jurisdiction . . . [and
> it] extends only to situations where there has been a
> termination or nonrenewal, actual or constructive . . . .
> So to secure relief for a violation of § 2805(f)(1), the
> franchisee must couch [its] relief in terms of a violation
> of §§ 2802-03.

Dersch subsequently amended its complaint to address
the jurisdictional concerns raised in the district court's
order, alleging that the defendants' coerced renewal vio-
lated both § 2802 and § 2805(f)(1). Thereafter, the parties
filed cross-motions for summary judgment. Dersch offered
two separate and distinct legal theories in support of its
PMPA claim. Dersch's primary argument was that the state
law waivers resulted in a constructive nonrenewal of the
parties' franchise relationship. In the alternative, Dersch
contended that even if the waivers did not constitute a
constructive nonrenewal of its franchise relationship, it was
still authorized to sue the defendants under the PMPA
because § 2805(f)(1) provides franchisees with an implied
private right of action to enforce the statute's provisions.
The defendants responded by asserting that even if Dersch
could meet the PMPA's threshold burden of demonstrating
a nonrenewal of its franchise relationship, *see* 15 U.S.C.
§ 2805(c), it could not prevail on its claim because the Dis-
puted Provisions were offered in good faith and in the
normal course of business pursuant to 15 U.S.C. § 2802(b)

(3)(A). The defendants also argued that the Disputed Provisions did not, in any event, require Dersch to waive any rights that it had under federal or state law. Finally, the defendants noted their agreement with the district court's conclusion—in its motion to dismiss order—that § 2805(f)(1) was "not an independent source of jurisdiction for relief under the PMPA."

On March 8, 2001, the district court granted the defendants' motion for summary judgment, and rendered its judgment that same day. In analyzing Dersch's claim under a constructive nonrenewal theory, the court noted that:

> Because this case deals entirely with specific provisions of the [Renewal] Contract, to successfully show a constructive nonrenewal, it appears that Dersch would have to show (1) that the Defendants failed to reinstate, continue, or extend the respective motor and [sic] fuel marketing or distribution obligations and responsibilities of itself and its franchisee under the prior franchise contract adversely affecting the franchisee and (2) that, if the complained-of contract provision is substantially new and not previously agreed-upon, it must adversely affect Dersch's obligations and responsibilities under the franchise . . . . If the franchisee can make its showing, there is one additional step. Under certain circumstances, a franchisor may be justified in nonrenewing a franchise relationship. A franchisor may nonrenew the franchise if the franchisor and franchisee fail to agree to additions to the existing franchise agreement, provided the franchisor proposes those additions in good faith, in the normal course of business, and not to prevent the renewal of the relationship.

The district court then evaluated each of the Disputed Provisions using this analytical framework. With respect to the Renewal Agreement's indemnity and change of de-

livery provisions, the district court found that: (1) the provisions were substantively the same as the provisions on the same subject matter contained in the 1982 Contract; and (2) even if these provisions were considered new terms, they did not run afoul of the PMPA because "[p]roposing an already-agreed-upon provision of the existing franchise agreement would fulfill Defendants' showing of good faith [under § 2802(b)(3)(A)],[6] and there is no contrary evidence." For these reasons, the district court held that Dersch could not demonstrate the constructive nonrenewal of its franchise relationship vis-a-vis these contract provisions.

The district court also concluded that the defendants' insistence on Dersch agreeing to the Renewal Agreement's joint and several liability provision and personal obligations and provisions clause did not constitute a constructive nonrenewal of the parties' franchise relationship. These contract provisions are contained in Article 21 of the Renewal Agreement and provide as follows:

### 21. BUSINESS ENTITY OR JOINT BUYER

21.1   General. This article shall apply if Buyer is a business entity or composed of more than one person (i.e., any combination of individuals and business entities).

21.2   Joint and Several Liability. If Buyer is composed of more than one person, the obligations imposed

---

[6]   A franchisor may nonrenew a franchise relationship if a franchisee refuses "to agree to changes in the franchise arrangement that result from 'determinations made by the franchisor in good faith and in the normal course of business.' " *Duff v. Marathon Petroleum Co.*, 51 F.3d 741, 744 (7th Cir. 1995) (quoting § 2802(b)(3)(A)).

hereunder shall be joint and several as to each such person, and all such obligations shall be deemed to apply to each person with the same effect as though that person were the sole Buyer.

21.3   Personal Obligations and Provisions. If Buyer is a business entity, all obligations and provisions hereof of a personal nature shall apply as if such business entity were an individual, and shall also apply insofar as is legally possible and reasonably practicable to those individual persons who have or exercise management responsibility for such business entity, including without limitation, officers, directors or agents of corporations and partners of partnerships. The business entity shall manage its affairs with respect to the personal obligations and provisions in a manner so as to give full force and effect to same.

R61, 19.

Dersch argued that Articles 21.2 and 21.3 violated § 2805(f)(1), thus constituting a constructive nonrenewal of its franchise relationship, because the provisions could be used by the defendants to impose personal liability on John Dersch and other managers, officers, and directors of the corporation. The district court rejected this argument, however, concluding that neither provision could serve as a basis for Dersch's constructive nonrenewal theory because: (1) Article 21.2 only applied if the "Buyer" was comprised of more than "one person," and the only "Buyer" to the Renewal Agreement was Dersch, a corporation; and (2) by its very terms (i.e., "insofar as is legally possible"), Article 21.3 was rendered inapplicable if any purported waiver contained in that provision violated § 2805(f)(1).

The district court also rejected Dersch's argument that § 2805(f)(1) provided it with an implied private right of action to enforce the statute's provisions, noting "[t]his Court previously concluded that § 2805(f)(1) only creates duties under the PMPA and is not an independent source of jurisdiction . . . . There [is] no indication that Congress intended to create an implied federal cause of action in enacting § 2805(f)." The court then held that "if § 2805(f)(1) does not create an implied cause of action . . . Dersch [can] only maintain a cause of action under the general PMPA provision conferring federal question jurisdiction onto federal courts."

Dersch filed a timely motion to alter or amend the district court's judgment, pursuant to Fed. R. Civ. P. 59(e), which the court denied. Dersch appeals the district court's decisions granting the defendants' motion for summary judgment, and denying its motions for summary judgment and to alter or amend the judgment.

## II.

This court reviews the district court's grant of summary judgment *de novo*, construing all facts in favor of Dersch, the nonmoving party. *Commercial Underwriters Ins. Co. v. Aires Envtl. Services, Ltd.*, 259 F.3d 792, 795 (7th Cir. 2001). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "[s]ummary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party." *Commercial Underwriters,* 259 F.3d at 795. We will reverse the denial of a Rule 59(e)

motion to alter or amend a judgment only for an abuse of discretion. *Britton v. Swift Transp. Co., Inc.*, 127 F.3d 616, 618 (7th Cir. 1997).

On appeal, Dersch argues that the district court erred in granting the defendants' motion for summary judgment because the analysis used by the court failed to give any consideration whatsoever to the substantive requirements of 15 U.S.C. § 2805(f)(1),[7] which provides that:

> No franchisor shall require, as a condition of entering into or renewing the franchise relationship, a franchisee to release or waive—(A) any right that the franchisee has under this subchapter or other Federal law; or (B) any right that the franchisee may have under any valid and applicable State law.

*Id.*

According to Dersch, the district court's analysis of § 2805(f)(1) was premised on "a misunderstanding of the basic procedural preconditions" for interpreting the Petroleum Marketing Practices Act ("PMPA" or "Act"), 15 U.S.C. § 2801-2806. Dersch contends that the district court erred in ruling that § 2805(f)(1) does not provide an implied private right of action to enforce the statute's provisions. Furthermore, Dersch asserts that even if § 2805(f)(1) does not contain an implied private right of action, it is still entitled to maintain a claim under the PMPA because the Disputed Provisions of the Renewal Agreement, imposed upon Dersch by the defendants, amount to a constructive nonrenewal of the parties' franchise relationship. Thus, at the very heart of this case is the role § 2805(f)(1) plays

---

[7] Congress enacted § 2805(f)(1) as part of the "Petroleum Marketing Practices Act Amendments of 1994," Pub. L. No. 103-371, 108 Stat. 3484.

within the rubric of the PMPA. The issues before us—i.e., whether § 2805(f)(1) contains an implied private right of action or may serve as the basis of a constructive nonrenewal claim under the PMPA—are issues of first impression for our circuit. We review questions of statutory construction *de novo. Miller Aviation v. Milwaukee County Bd. of Supervisors*, 273 F.3d 722, 728 (7th Cir. 2001).[8]

### A.  The Petroleum Marketing Practices Act - 15 U.S.C. §§ 2801-2806

Before addressing the merits of Dersch's arguments, it is necessary to give a brief overview of the scope and structure of the PMPA. The PMPA governs franchise arrangements for the sale, consignment, or distribution of motor fuel "in commerce," and protects franchisees from arbitrary or discriminatory termination or nonrenewal of their motor fuel franchises. *Beachler v. Amoco Oil Co.*, 112 F.3d 902, 904 (7th Cir. 1997); *Beck Oil Co., Inc. v. Texaco Ref. & Mktg., Inc.*, 25 F.3d 559, 561 (7th Cir. 1994). Both the text and structure of the Act indicate that Congress enacted the PMPA to address the disparity in bargaining power then existing between franchisors (typically major oil companies) and franchisees in the petroleum industry, *Beck Oil*, 25 F.3d at 561, and "to level the playing field on which these parties interact." *Beachler*, 112 F.3d at 904. The PMPA was designed to accomplish this purpose by providing a single, uniform set of rules governing the termination of petroleum fran-

---

[8]  We pause to note "that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.,* the courts' statutory or constitutional *power* to adjudicate the case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998).

chises and nonrenewal of petroleum franchise relationships. *See generally* 15 U.S.C. §§ 2801-2806. The PMPA prohibits franchisors from terminating a franchise or discontinuing a franchise relationship, 15 U.S.C. § 2802(a), unless the franchisor does so pursuant to one of the grounds enumerated in the Act, 15 U.S.C. §§ 2802(b)(2)-(3) or 2803(c), and meets the notification requirements contained in 15 U.S.C. § 2804. Thus, the PMPA strikes a balance between the rights of franchisors and the rights of franchisees, by affording franchisees important but limited procedural rights, while at the same time providing franchisors with significant latitude to respond to changing market conditions. *Beachler,* 112 F.3d at 904-05; *Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1220 (7th Cir. 1982).

If a franchisor terminates a franchise or fails to renew a franchise relationship in accordance with the PMPA, the franchisee may maintain a civil action under 15 U.S.C. § 2805(a) and/or (b). *Lippo v. Mobil Oil Corp.*, 776 F.2d 706, 720 (7th Cir. 1985). In order to prevail, the franchisee must prove, as a threshold matter, a termination of its franchise or the nonrenewal of its franchise relationship within the meaning of the Act. 15 U.S.C. § 2805(c) ("the franchisee shall have the burden of proving the termination of the franchise or the nonrenewal of the franchise relationship."); *Beachler*, 112 F.3d at 905 ("It of course is the franchisee's initial burden under the PMPA to establish that its franchise has been terminated or not renewed . . . and if it fails to satisfy that burden, our inquiry is at an end.").[9] It is only then that the franchisor has "the burden of going forward [and] establishing that it is entitled to one of the affirmative

---

[9] The PMPA gives franchisees the right to seek a preliminary injunction prior to the expiration of the franchise agreement. *See* 15 U.S.C. § 2805(b)(2)(A)-(B).

defenses set forth in the Act [i.e., 15 U.S.C. §§ 2802(b), 2803(c)]." *Duff v. Marathon Petroleum Co.*, 51 F.3d 741, 744 (7th Cir. 1995) (citing § 2805(c)). With the foregoing principles in mind, we now turn to the merits of Dersch's lawsuit.

### B.  Dersch's 15 U.S.C. § 2805(f)(1) claim

Dersch's first argument on appeal is that § 2805(f)(1) provides franchisees with an implied private right of action to enforce the statute's provisions. Dersch claims that this is so because "there is no suggestion in the language or legislative history of Section 2805(f)(1)" that a franchisee must demonstrate the nonrenewal of its franchise relationship, pursuant to § 2805(c), before maintaining a suit under the PMPA for a franchisor's violation of the statute. While the plain meaning of § 2805(f)(1)'s text is clearly important, this statutory subsection must still be construed in its proper context. *Smith v. Zachary*, 255 F.3d 446, 448 (7th Cir. 2001), *cert. denied*, 122 S.Ct. 1207 (2002) (holding that "[t]he plain meaning rule is applicable when the statutory language is clear, unambiguous, and not controlled by other parts of the act or other acts on the same subject."). "A statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent. Consequently, each part or section should be construed in connection with every other part or section so as to produce a harmonious whole. Thus, it is not proper to confine interpretation to the one section to be construed." 2A Norman J. Singer, *Sutherland Statutory Construction* § 46:05 (6th ed. 2000).

Section 2805(f)(1) is contained in the PMPA's "enforcement provisions" along with 15 U.S.C. § 2805(a), which is entitled "maintenance of civil action by franchisee against franchisor; jurisdiction and venue; time for commencement

of action," *id.*, and delineates all of the statutory require-
ments for maintaining a cause of action under the PMPA.
*See also* 15 U.S.C. § 2805(b) (outlining statutory require-
ments for obtaining equitable relief under the Act). Section
2805(a) provides that "[i]f a franchisor fails to comply with
the requirements of section *2802 or 2803*[10] of this title, the
franchisee may maintain a civil action against such
franchisor . . . ." *Id.* (emphasis added). *See also* § 2805(b)(1)
(district courts may grant equitable relief to franchisees,
maintaining an action under § 2805(a), "to remedy the
effects of any failure to comply with the requirements of
section *2802 or 2803* of this title . . . .") (emphasis added);
*accord* §§ 2805(c), 2805(d), 2805(e).

Like the district court, we believe that the existence of an
explicit cause of action in § 2805(a) and (b)—i.e., one based
on a franchisor's violation of §§ 2802 or 2803—makes it
highly unlikely that Congress absentmindedly forgot to
provide a cause of action for § 2805(f)(1). *See Dersch Ener-
gies, Inc. v. Shell Oil Co.*, 2001 WL 1803652, *3 (S.D. Ill. May
15, 2001). It is an elemental canon of statutory construction
that "where a statute expressly provides a particular rem-
edy or remedies, a court must be chary of reading others
into it." *Transamerica Mortgage Advisors, Inc. (TAMA) v.
Lewis*, 444 U.S. 11, 19-20 (1979). Thus, " '[w]hen a statute
limits a thing to be done in a particular mode, it includes
the negative of any other mode.' " *Id.* (citation omitted).
Therefore, while the text of § 2805(f)(1) clearly displays an
intent to prohibit certain conduct, the PMPA does not pro-
vide franchisees with a distinct and independent remedy
for a franchisor's violation of this statutory subsection. *See
Gonzaga Univ. v. Doe*, 122 S.Ct 2268, 2275-76 (2002) (holding

---

[10] Section 2803 applies to trial and interim franchises, and there-
fore is not at issue in this case.

that "even where a statute is phrased in such explicit rights-creating terms, a plaintiff suing under an implied right of action still must show that the statute manifests an intent 'to create not just a private right but also a private *remedy.*' "). As we recently emphasized in *Miller Aviation v. Milwaukee County Bd. of Supervisors*, 273 F.3d 722 (7th Cir. 2001),

> A private right of action to enforce federal law must be created by Congress . . . [I]n evaluating whether a statute contains a private right of action . . . [t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent *to create not just a private right but also a private remedy.* Statutory intent on this latter point is determinative. Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute. "Raising up causes of action where a statute has not created them may be a proper function for common-law courts but not for federal tribunals."

*Id.* at 729-30 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001)) (emphasis added).

Because "statutory intent" is "determinative" on the question of whether Congress intended to create a private remedy, *Miller*, 273 F.3d at 730, we conclude that a franchisee may only maintain a civil action under the PMPA for violations of § 2805(f)(1) if those violations constitute a nonrenewal of its franchise relationship under § 2802 or 2803.[11]

---

[11] For identical reasons, we reject Dersch's argument that 28 U.S.C. § 1331 provides it with an *independent* jurisdictional basis to maintain an action against the defendants under the PMPA.

### C.  Dersch's "Constructive" Nonrenewal Claim

This leads us to Dersch's next claim, that the defendants' violation of § 2805(f)(1) constitutes a "constructive" nonrenewal of its franchise relationship under § 2802. Dersch appears to argue that if a franchisor conditions the renewal of a franchise relationship on the franchisee releasing or waiving rights that it has under federal or state law, there has been no renewal of that relationship within the meaning of the PMPA.

The district court rejected this argument, holding that the parties' franchise relationship had been renewed because the Renewal Agreement was, in substance, identical to the parties' prior franchise agreement. The court also held that even if the Disputed Provisions could be characterized as changes or additions to the parties' franchise, i.e., new contract terms, Dersch would still not be able to prevail on its claim because "[p]roposing an already-agreed-upon provision of the existing franchise agreement would fulfill Defendants' showing of good faith [under § 2802(b)(3)(A)], and there is no contrary evidence."[12]

On appeal, Dersch takes issue with both of these conclusions. First, Dersch argues that while "it might seem logical to infer that an offer to renew existing contract terms

---

[12] The district court also held, with respect to Articles 21.2 and 21.3, that these contract provisions did not require Dersch to waive any rights that it had under state law. Because we conclude *infra* that Dersch cannot succeed on its constructive nonrenewal claim, even if these contract provisions required it to waive certain state law rights, we need not address this aspect of the district court's holding. For this same reason, we decline to address the parties' detailed arguments on whether each of the Disputed Provisions required Dersch to release or waive state law rights in violation of § 2805(f)(1)(B).

would not amount to a constructive nonrenewal, such an inference cannot be made when Section 2805(f)(1) is involved." According to Dersch, a franchisor can violate § 2805(f)(1) even if it offers a franchisee an agreement identical to the one set to expire because § 2805(f)(1)'s release and waiver prohibition specifically applies when the parties are "*renewing* the franchise relationship." § 2805(f)(1) (emphasis added). As such, Dersch contends that it would render § 2805(f)(1) meaningless if a franchisor could avoid the statute's release and waiver prohibition by simply offering to renew a franchise relationship on terms and conditions identical to those contained in the parties' prior franchise agreement. Second, Dersch contends that to the extent the district court assumed a nonrenewal of the parties' franchise relationship and treated the Disputed Provisions as "new" terms, it erred in holding that the defendants were entitled to use § 2802(b)(3)(A)—which permits franchisors to nonrenew a franchise relationship if the franchisee refuses to agree to changes or additions made in good faith and in the normal course of business—to circumvent § 2805(f)(1)'s release and waiver prohibition. In short, Dersch asserts that the district court's test for analyzing its constructive nonrenewal claim: (1) "kept it from giving any consideration whatsoever to the substantive requirements of Section 2805(f)(1)," and (2) permits "franchisors to continue to insist upon the waiver or release of rights, if they have historically done so." This approach, Dersch argues, ends up grandfathering a problem that Congress sought resolve when it amended the PMPA to include § 2805(f)(1).

We agree with Dersch's argument in some respects. There is no question that § 2805(f)(1) was enacted to provide franchisees with a certain amount of protection during the negotiation process of "entering into or renewing the

franchise relationship." Furthermore, like Dersch, we think that the meaning of § 2805(f)(1)'s text is clear; a franchisor may not condition the renewal of a franchise relationship on a franchisee releasing or waiving rights under federal or state law. As such, a franchisor cannot circumvent § 2805(f)(1)'s release and waiver prohibition by offering to renew the parties' franchise relationship on terms and conditions identical to those contained in a prior franchise agreement, whether the prior agreement was entered into before or after the enactment of the statute. Nor is a franchisor permitted to use § 2802(b)(3)(A) to do an end run around § 2805(f)(1)'s release and waiver prohibition. However, while we agree with Dersch's interpretation of § 2805(f)(1)'s meaning, this only calls into question the reasoning of the district court's decision, not its ultimate conclusion—that the defendants' alleged violation of § 2805(f)(1) did not result in a constructive nonrenewal of the parties' franchise relationship. For the reasons that follow, we conclude that the district court's decision must stand because Dersch's franchise relationship with the defendants was renewed within the meaning of the PMPA. *See, e.g., Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 332 (7th Cir. 2002) (holding that " '[a]n appellate court may affirm the district court's [decision] on any ground supported by the Record, even if different from the grounds relied upon by the district court.' ") (citation omitted).

As previously discussed, the PMPA was enacted to address one narrow, yet crucial, aspect of petroleum franchise relationships—the termination of franchises and the nonrenewal of franchise relationships. Most of the time, it is obvious when a termination or nonrenewal has taken place. There are, however, situations where a franchisor's actions will *indirectly* result in the termination of a franchise or the nonrenewal of a franchise relationship—i.e., an

informal termination or nonrenewal. We recognized this possibility in *Beachler*, 112 F.3d at 906, when we held that the assignment of a franchise will result in a termination or nonrenewal, within the meaning of the PMPA, if a franchisee demonstrates that the assignment terminated or discontinued any of the " '*three statutory components of the franchise agreement,' which include 'the contract to use the refiner's trademark, the contract for the supply of motor fuel, [and] the lease of the premises*,' " *id.* (citation omitted) (emphasis added), or that the assignment of the franchise was made in violation of state law. *Id.* ("If an assignment is found to be invalid under state law, it will necessarily result in a termination of the franchise that is prohibited by the Act."). *See also Shukla v. B.P. Exploration & Oil, Inc.*, 115 F.3d 849, 852-54 (11th Cir. 1997); *Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc.*, 940 F.2d 744, 750-52 (1st Cir. 1991); *Ackley v. Gulf Oil Corp.*, 726 F. Supp. 353, 360 (D. Conn.), *aff'd mem.*, 889 F.2d 1280 (2d Cir. 1989); *May-Som Gulf, Inc. v. Chevron U.S.A., Inc.*, 869 F.2d 917, 922-25 (6th Cir. 1989).

Dersch, however, makes no attempt to argue that the "coerced" release or waiver of the aforementioned state law "rights" compromised or diminished, in any manner whatsoever, its ability to lease retail premises or sell branded motor fuel.[13] Instead, Dersch argues that the offer of a franchise renewal on a "take-it-or-leave-it basis," in violation of § 2805(f)(1), constitutes a "failure to renew" under the PMPA, even when a franchisee's statutory "franchise" has, in fact, been renewed. The interdependence between certain provisions of the PMPA, however, make this argument untenable.

---

[13] In fact, Dersch has continued to sell Shell-branded motor fuel throughout the course of this litigation pursuant to the terms of the Renewal Agreement.

The composition of a petroleum franchise is delineated with precision in the Act's definitions for "franchise" and "franchise relationship." The PMPA defines the term "franchise relationship" as "the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a *franchise*." 15 U.S.C. § 2801(2) (emphasis added). The term "franchise" means any contract between a franchisor, as defined by 15 U.S.C. § 2801(3), and a franchisee, as defined by 15 U.S.C. § 2801(4), under which the franchisor authorizes or permits the franchisee "to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such [franchisor] . . . which authorizes or permits such use." 15 U.S.C. § 2801(1)(A). A "franchise" covers the essential contracts between a franchisor and a franchisee—i.e., contract to use the supplier's trademark in connection with retail sales, contract for supply of fuel to be sold under the trademark, and a lease of premises for the sale of fuel. 15 U.S.C. § 2801(1). A "franchise relationship" then is "an entity separate from, *but defined by*, the 'franchise,' or contractual arrangement existing between the parties." *Unocal Corp. v. Kaabipour*, 177 F.3d 755, 764 n.6 (9th Cir. 1999) (emphasis added). *See also Han v. Mobil Oil Corp.*, 73 F.3d 872, 876 (9th Cir. 1995). Therefore, when a franchisee alleges that a franchisor has "failed to renew" the parties' franchise relationship, i.e., "reinstate, continue, or extend the *franchise relationship*," 15 U.S.C. § 2801(14) (emphasis added), as required by § 2802(a)(2), it must demonstrate that at least one of the three essential components of a petroleum franchise has been discontinued. This principle—which is nothing more than a restatement of our holding in *Beachler*—applies whether a franchisee's constructive nonrenewal claim is based on the assignment of its franchise or of a franchisor's alleged violation of § 2805(f)(1).

Because Dersch does not argue that the defendants' alleged violation of § 2805(f)(1) resulted in the nonrenewal of a lease of retail premises, motor fuel supply contract, or the contract to use the Shell trademark in connection with retail sales, it cannot demonstrate the nonrenewal of its franchise relationship within the meaning of the PMPA.

The central problem with Dersch's argument, and indeed with the district court's reasoning below, is that it presumes a franchisee can only enforce § 2805(f)(1)'s release and waiver prohibition in the context of a PMPA claim. While it is certainly possible for a § 2805(f)(1) violation to result in the nonrenewal of a franchise relationship, that will not always be the case. When a franchisor's violation of § 2805(f)(1) does not result in a nonrenewal of the parties' franchise relationship, a franchisee must resort to remedies outside of the PMPA to vindicate its rights under the stat-ute. We reach this conclusion for several reasons. To begin with, as we have repeatedly emphasized, the PMPA is only designed to regulate a narrow aspect of petroleum franchise relationships—the termination of franchises and the nonrenewal of franchise relationships. *See generally* §§ 2801-2806. While it is true that § 2805(f)(1) was enacted to address the disparity of bargaining power existing between franchisors and franchise outside the termination/ non-renewal context, i.e., during the negotiation process for entering into or renewing a franchise relationship,[14] there is nothing in the PMPA suggesting that Congress intended for franchisees to sue franchisors under the Act's remedial provisions for violations of § 2805(f)(1) when a termination

---

[14] *See also* 15 U.S.C. § 2805(f)(2), which provides that the "*interpre-tation* or *enforcement*" of the "franchise" shall be governed by the law of the State "in which the franchisee has [its] principal place of business . . . ." (emphasis added).

or nonrenewal is not at issue. As previously explained, "even where a statute is phrased in such explicit rights-creating terms, a plaintiff suing under an implied right of action still must show that the statute manifests an intent 'to create not just a private right but also a private remedy.'" *Gonzaga Univ.*, 122 S.Ct at 2275-76 (citation omitted). By not amending the PMPA's remedial provisions to include a private right of action to enforce § 2805(f)'s provisions, Congress made clear its intent for franchisees to resort to remedies outside the PMPA context for redress of violations of the statute when a nonrenewal is not at issue. This conclusion is further supported by the Act's preemption clause, which provides that:

> To the extent that any provision of this subchapter applies to the *termination* (or the furnishing of notification with respect thereto) of any franchise, or to the *nonrenewal* (or the furnishing of notification with respect thereto) *of any franchise relationship*, no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) *with respect to termination* (or the furnishing of notification with respect thereto) *of any such franchise or to the nonrenewal* (or the furnishing of notification with respect thereto) *of any such franchise relationship* unless such provision of such law or regulation is the same as the applicable provision of this subchapter.

15 U.S.C. § 2806(a)(1) (emphasis added).

By specifying with such precision when the States must stand aside in favor of federal regulation, Congress implicitly marked the outer bounds of the power it intended to

exercise.[15] *Geib v. Amoco Oil Co.*, 29 F.3d 1050, 1058 (6th Cir. 1994); *Continental Enterprises, Inc. v. Am. Oil Co.*, 808 F.2d 24, 27 (8th Cir. 1986); *Esso Standard Oil Co. v. Dept. of Consumer Affairs*, 793 F.2d 431, 434 (1st Cir. 1986). Beyond those limits, "state regulation may claim full federal approbation." *Continental Enterprises*, 808 F.2d at 27. *See also Esso*, 793 F.2d at 434 (holding that Congress, by enacting § 2806, did not intend " 'to preempt all state provisions involving the substantive aspects of petroleum-products franchises.' ") (citation omitted).

It is also important to keep in mind that the regulation of petroleum franchise relationships has traditionally been a matter of local concern in which the parties frame their relationships with reference to State law. *Hanes v. Mid-America Petroleum, Inc.*, 577 F. Supp. 637, 644 (W.D. Mo. 1983). *Cf.* § 2805(f)(2); *Lippo*, 776 F.2d at 712 (holding that petroleum franchise agreements are interpreted according to state contract law); *Brach*, 677 F.2d 1217-18 (same). Congress enacted the PMPA to federalize the standards by which petroleum franchises are terminated and petroleum franchise relationships are nonrenewed, not to create a federal common law for governing petroleum franchise agreements. *O'Shea v. Amoco Oil Co.*, 886 F.2d 584, 593 (3d Cir. 1989). In other words, the PMPA was not designed to provide franchisees with a federal forum for the resolution of run-of-the-mill contract disputes like those at issue in this case. Without termination or nonrenewal, Dersch has no claim under the PMPA. Dersch is, however, entitled

---

[15] This is an application of the familiar canon of statutory construction *expressio unius est exclusio alterius*, which provides that "to express or include the one thing implies the exclusion of the other . . . ." Black's Law Dictionary 602 (7th ed. 1999). *See also Freightliner Corp. v. Myrick*, 514 U.S. 280, 288 (1995).

to bring a state law claim to enforce its rights under § 2805(f)(1), such as economic duress. *See, e.g., Hurd v. Wildman, Harrold, Allen & Dixon*, 707 N.E.2d 609, 614 (Ill. App. Ct. 1999) (holding that "[e]conomic duress is a condition where one is induced by a wrongful act or threat of another to make a contract under circumstances that deprive one of the exercise of one's own free will."). In any event, whether the Disputed Provisions are voidable under state law is not a question that can be resolved under the remedial provisions of the PMPA.

We, therefore, conclude that if a franchisor impermissibly conditions the renewal of a petroleum franchise relationship on the relinquishment of any right that a franchisee has under federal or state law, and the coerced relinquishment of that right does not result in a nonrenewal of the parties' franchise relationship, the franchisee must resort to remedies outside of the PMPA context to enforce § 2805(f)(1)'s release and waiver prohibition—primarily, if not exclusively, through state law remedies. Section 2805(f)(1)'s release and waiver prohibition then, in this case, provides Dersch with a claim under state law to challenge the validity of the Disputed Provisions. This is certainly not unusual given the structure of our federalist system of government. As we noted in *Spearman v. Exxon Coal USA, Inc.*, 16 F.3d 722 (7th Cir. 1994), "[m]any federal rules serve as the jumping-off point for state claims without converting these into claims under federal law." *Id.* at 725. *See also Seinfeld v. Austen*, 39 F.3d 761, 764 (7th Cir. 1994) (noting that state law actions are ofttimes premised on a violation of federal law).

In reaching this determination, we are by no means suggesting that § 2805(f)(1) only operates at the state level. On the contrary, if a franchisor impermissibly conditions the renewal of a franchise relationship on the franchisee releas-

ing or waiving federal or state law rights, and the franchisee's refusal to agree to this conditional renewal results in the nonrenewal of that relationship, the franchisor's violation of § 2805(f)(1) may be examined in conjunction with the franchisee's claim for the nonrenewal of its franchise relationship. *See, e.g., Carter v. Exxon Co. U.S.A., a Div. of Exxon Corp.*, 177 F.3d 197, 200-03 (3d Cir. 1999); *Riverdale Enterprises, Inc. v. Shell Oil Co.*, 41 F. Supp. 2d 56, 64-67 (D. Mass. 1999). *See also Korangy v. Mobil Oil Corp.*, 84 F. Supp. 2d 660, 666-67 (D. Md. 2000).

Moreover, the PMPA requires franchisors to provide franchisees with a formal notice of termination or nonrenewal, which, in most cases, must be given 90 days in advance. 15 U.S.C. § 2804. During this 90-day period, a franchisee may, and often does, seek injunctive relief to prevent the franchisor from terminating its franchise or nonrenewing its franchise relationship under the lenient standard provided by the Act in 15 U.S.C. § 2805(b)(2).[16]

---

[16] Section 2805(b)(2) provides that a district is required to issue a preliminary injunction if:

> **(A)** the franchisee shows—
>
> **(i)** the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and
>
> **(ii)** there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and
>
> **(B)** the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

(continued...)

*Beachler*, 112 F.3d at 905 (noting that a "franchisee is entitled to a preliminary injunction under the Act based upon a lesser showing than would be required in the ordinary case under Fed. R. Civ. P. 65."). Because "[d]istrict courts . . . enjoy broad discretion in fashioning temporary equitable remedies, especially under the PMPA's lenient standard," *Koylum v. Peksen Realty Corp.*, 272 F.3d 138, 147 (2d Cir. 2001), a district court has the power to preserve the status quo between the parties during the pendency of the litigation (i.e., the existing terms of the franchise relationship). *Id.* In this respect, the PMPA protects franchisees not only from arbitrary and discriminatory termination or nonrenewal, but also from the harmful effects of threatened termination or nonrenewal. *See, e.g., Shell v. Shell Oil Co.*, 216 F. Supp. 2d 634, 639-40 (S.D. Tex. 2002).

Thus, Dersch's assertion that it was forced to execute the Renewal Agreement rings hollow. As one court recently noted, "[b]ecause a franchisor cannot terminate without providing the requisite notice, threats of termination unaccompanied by explicit notice pursuant to § 2804 have no teeth." *Shell Oil Co.*, 216 F. Supp. 2d at 640. Once the § 2804 notice is issued, the franchisee may immediately avail itself of the protections afforded by § 2805, *id.*, and therefore Dersch was not in the "Catch-22" envisioned by the dissent—i.e., either waiving its legal rights under § 2805(f)(1) or committing "economic suicide" by allowing its gasoline

---

[16] (...continued)

Thus, once the franchisee establishes a termination or nonrenewal, it need only prove "a reasonable chance of success on the merits" of its claim of a PMPA violation and that the balance of hardships tips in its favor. *Beachler*, 112 F.3d at 905. Additionally, the franchisee need not establish that it would be irreparably harmed in the absence of an injunction. *Id.*

supply to be terminated. A district court within our circuit recently made this same observation, noting:

> [A] franchisee [need not] go out of business in order to obtain relief from improper nonrenewal. A franchisee presented with a renewal agreement so coercive that it suggests that the franchisor's ulterior motive is to prevent renewal can refuse the agreement. If the franchisor is unwilling to renew, it must notify the franchisee of nonrenewal ninety days before the nonrenewal is to take effect. 15 U.S.C. § 2804(a). During this ninety-day interim, the franchisee may seek a preliminary injunction to prevent enforcement of the nonrenewal. Under the protection of an injunction, the franchisee can continue operating its business on the terms of the previous agreement while the merits of its action against the franchisor are resolved. The availability of injunctive relief ensures that a franchisee need not go out of business before seeking relief from improper nonrenewal.

*Jet, Inc. v. Shell Oil Co.*, 2002 WL 31641627, *4 (N.D. Ill. November 22, 2002). *See also Beachler*, 112 F.3d at 905 (holding that "Congress' remedial purpose in enacting the PMPA is reflected in the provision providing for preliminary injunctive relief.").

The dissent claims that in making this point we have contradicted the crux of our holding—i.e., that a franchisee cannot maintain a claim for a § 2805(f)(1) violation unless it results in the nonrenewal of the franchise relationship—because:

> In effect, the majority is saying that, in a § 2805(f)(1) case like the one before us, the statutory notice of nonrenewal is the precise equivalent of nonrenewal itself and may be treated as nonrenewal for purposes of

maintaining suit. This position, of course, recognizes the validity of constructive nonrenewal, a concept that the majority opinion has otherwise attempted thoroughly to demolish.

Dissent at 42.

In one respect, the dissent is correct: a franchisor's issuance of a notice of nonrenewal is the precise equivalent of a nonrenewal. *Lippo*, 776 F.2d at 720 (noting that "[i]n an action brought under section 2805(a) the franchisee has the burden of proving termination [or nonrenewal] of the franchise. (*This must really mean attempted termination [or nonrenewal] if the injunctive relief is to be of any use.*)") (emphasis added); *Jet, Inc.*, 2002 WL 31641627 at *5 (holding that "[b]y lowering the required showing [under § 2805(b)(2)], the Act's remedial scheme prevents nonrenewal from taking place until a franchisee's case can be heard on the merits."). The dissent is also correct when it asserts that a franchisee is not precluded from seeking relief under the PMPA merely because the franchisor failed to issue a formal notice of nonrenewal. Dissent at 45. Neither of these observations, however, supports the dissent's overall argument, which is premised on an overly expansive definition of "constructive nonrenewal."

According to the dissent, "[c]onstructive nonrenewal merely means treating something which is literally or in fact not nonrenewal as actual nonrenewal for purposes of litigation." Dissent at 42. This definition of constructive nonrenewal, however, cannot be reconciled with this court's holding in *Beachler* or § 2805(c)'s requirement that franchisee must, as a threshold matter, demonstrate the nonrenewal of its franchise relationship. Furthermore, contrary to the dissent's repeated assertions, we do not reject the constructive nonrenewal approach accepted by the vast majority of our sister circuits. Our opinion specifically

recognizes that a franchisee may bring a cause of action under the PMPA when a franchisor's actions result in the loss of one of the three statutory components comprising a "franchise" under the Act—i.e., lease of retail premises, motor fuel supply contract, or the contract to use the franchisor's trademark. In such cases, this circuit and several of our sister circuits have held that a franchisee may maintain an action under § 2802 for the nonrenewal of its franchise relationship; an action which is commonly referred to as a claim for "constructive nonrenewal."[17] *Beachler*, 112 F.3d at 906; *Shukla v. B.P. Exploration & Oil, Inc.*, 115 F.3d 849, 852-54 (11th Cir. 1997); *Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc.*, 940 F.2d 744, 750-52 (1st Cir. 1991); *Ackley v. Gulf Oil Corp.*, 726 F. Supp. 353, 360 (D. Conn.), *aff'd mem.*, 889 F.2d 1280 (2d Cir. 1989); *May-Som Gulf, Inc. v. Chevron U.S.A., Inc.*, 869 F.2d 917, 922-25 (6th Cir. 1989).

What we do reject is the constructive nonrenewal theory advanced by the dissent, which, to our knowledge, has only been endorsed by the Ninth Circuit. *See Pro Sales, Inc. v. Texaco, U.S.A.*, 792 F.2d 1394, 1399 (9th Cir. 1986). In *Pro Sales*, the court held that "a franchisee who signs a successor contract under protest and promptly seeks to invoke its rights under the PMPA . . . has not 'renewed' the franchise relationship so as to bar relief under the PMPA." *Id.* at 1399. There are several problems, however, with the dis-

---

[17] The "constructive" label, however, can be confusing. This characterization does not mean that a franchisee can maintain a PMPA claim based on franchise policy disagreements. In the context of the PMPA, constructive means "not directly expressed, but inferred," *The Compact Oxford English Dictionary* 322 (2d ed. 1989), i.e., an indirect or informal termination or nonrenewal. *See Beachler*, 112 F.3d at 906.

sent's reliance on *Pro Sales*. To begin with, Dersch did not
"promptly seek to invoke its rights under the PMPA." In
*Pro Sales*, the franchisee signed the contested franchise
agreement and, at the same time, filed suit under the
PMPA. 792 F.2d at 1396. The franchisee also moved for,
and was granted, a temporary restraining order continuing
the terms of the old franchise agreement. *Id.* Here, in
contrast, Dersch signed the Renewal Agreement and
operated under the terms of that agreement for just under
a year before filing suit.[18] Thus, even were we inclined to
consider applying the reasoning of *Pro Sales* in this case,
Dersch has met only the first prong of the test articulated
in that opinion—i.e., signing the agreement "under pro-
test." *See Shell Oil Co.*, 216 F. Supp. 2d at 642 (noting "that
there is no allegation in this case that any Plaintiff accepted
the renewal agreements under protest while simulta-
neously bringing suit, as was the case in *Pro Sales*.").

Even more problematic, however, is the fact that the *Pro
Sales* court completely disregards the statutory protection
afforded to franchisees who receive a formal notice of
termination or nonrenewal under the PMPA. As previously
noted, once a franchisor issues a formal notice of nonre-
newal, a franchisee may immediately seek injunctive relief
under § 2805(b)(2). The *Pro Sales* court, however, ignored
a franchisee's ability to obtain an injunction under the
PMPA, and relied *exclusively* on the legislative history of
the Act in support of its holding. 792 F.2d at 1399 (noting

---

[18] Indeed, one of the arguments made by the franchisee in *Pro
Sales* was that "its continuation of the franchise relationship only
under the terms of the TRO, and not under the terms of either
successor contract . . . bears on whether its actions constitute[d]
[a] nonrenewal." *Pro Sales*, 792 F.2d at 1399 n.6.

that "[t]he legislative history of the Act reflects a number of specific concerns . . . [one of those being] that franchisee independence may be undermined by the use of actual or threatened termination or nonrenewal . . . ."). We have held, however, that "[l]egislative history is problematic under the best circumstances, and even so reliable a source as the Conference Committee Report may be used only when there is a genuine ambiguity in the statute." *Board of Trade of City of Chicago v. S.E.C.*, 187 F.3d 713, 720 (7th Cir. 1999). By enacting § 2805(b)(2), Congress clearly indicated the means by which it would protect franchisees from being coerced into signing a new franchise agreement against their will. *NSY, Inc. v. Sunoco, Inc.*, 218 F. Supp. 2d 708, 712 (E.D. Pa. 2002) (noting that "[t]he PMPA gives the franchisee a cause of action against the franchisor for violations of the Act's provisions, including the right to seek a preliminary injunction prior to the expiration of the franchise agreement.").

Moreover, given the lenient standard for obtaining injunctive relief under the PMPA, we do not accept the Ninth Circuit's assertion in *Pro Sales*—echoed by the dissent in this case—that franchisees would be forced to go out of business before invoking the protections of the Act unless they are permitted to sign renewal agreements under protest. 792 F.2d at 1399. If a franchisee is able to demonstrate that the franchisor's attempted termination or non-renewal violates the PMPA, the district court is required to issue an injunction to protect the franchisee's economic interests during the pendency of the case. If, on the other hand, a franchisee (like Dersch) cannot make such a showing because its statutory "franchise" has been renewed, that franchisee must seek redress at the state level to enforce its contract rights under the franchise agreement—i.e., violations of § 2805(f)(1) that do not constitute a non-

renewal under the PMPA but are instead ordinary contract disputes.[19]

Here, Dersch's actions dictated its fate. Had Dersch allowed the defendants to issue a formal notice of non-renewal, its dispute with the defendants would have been transformed from a mere contract dispute into a non-renewal (within 90 days) of its franchise relationship—thus allowing it to meet its burden under § 2805(c) and maintain suit against the defendants via § 2805(a)-(b). However, by signing the renewal agreement, and thus renewing its statutory "franchise," Dersch divested itself of the right to bring an action under the PMPA.[20] Although federal courts

---

[19] In *Pro Sales*, the court seems to endorse the concept that a franchisee may forego the requirements of § 2805(b)(2) and simply issue itself a *de facto* injunction by signing an agreement under protest because the franchisee's ability to continue in business under the terms of an "illegal" contract is within its control, 792 F.2d at 1399 n.7, whereas the issuance of an injunction is "uniquely within the power of the district court to grant . . . ." *Id.* To follow such an approach, however, would result in this court substituting its judgment for that of Congress. That, of course, is not a proper function of the judiciary, *United States v. McKinney*, 98 F.3d 974, 979 (7th Cir. 1996), and we therefore find this aspect of the *Pro Sales* court's reasoning unpersuasive.

[20] As previously noted, a formal notice of nonrenewal is not necessarily a prerequisite to filing suit under the PMPA. The significance of the notice is that it formally expresses the franchisor's intent to discontinue the parties' franchise relationship (within 90 days), and therefore constitutes a "nonrenewal" for purposes of § 2805(c). Thus, if the actions of a franchisor indirectly result in a termination or nonrenewal (e.g., an assignment of the franchise), and no notice is issued in conjunction with that action, the franchisee is clearly not precluded from filing suit
(continued...)

are required to grant the PMPA "a liberal construction consistent with is overriding purpose to protect franchisees," *Brach*, 677 F.2d at 1221, we are not empowered "to take liberties with the PMPA's carefully stated provisions and reengineer the statute in the name of rough justice." *C.K. Smith & Co., Inc. v. Motiva Enterprises LLC.*, 269 F.3d 70, 76 (1st Cir. 2001). *See also Shell Oil Co.*, 216 F. Supp. 2d at 641 (holding "[t]his Court does not have license to read a remedy into a statute that Congress did not enact. Section 2804 and 2805 provide adequate remedies for aggrieved dealers consistent with the balancing of interests the PMPA drafters intended to achieve.") (internal citation omitted). After all, the PMPA "constituted a diminution of the property rights of franchisors and thus should not be interpreted to reach beyond its original language and purpose." *May-Som Gulf*, 869 F.2d at 921.

In this case, Dersch chose to renew its franchise relationship with the defendants—thus reaping the benefits of renewal (i.e., the continued supply of branded gasoline)—but objected to contract provisions that it deemed to be violative of § 2805(f)(1). While the Disputed Provisions may indeed violate § 2805(f)(1), they clearly have no impact on Dersch's statutory "franchise." As such, Dersch is precluded from using the remedial provisions of the PMPA to sue the defendants for a "constructive nonrenewal" of its franchise relationship when all of the essential statutory components of its PMPA franchise remain intact. *Beachler*, 112 F.3d at 906. Therefore, to the extent that Dersch con-

---

[20] (...continued)
under the PMPA, even in the absence of such notice. *Beachler*, 112 F.3d at 903-04. The central inquiry in both instances is whether the franchisor has terminated the franchisee's statutory franchise or failed to renew the parties' franchise relationship, or *formally* expressed its intent to do so.

tends that the defendants have failed to renew the parties' franchise relationship because they violated § 2805(f)(1), it has failed to state a claim upon which relief can be granted under the Act.

**III**.

Section 2805(f)(1) does not provide franchisees with an implied private right of action for a franchisor's violation of its provisions. Furthermore, the defendants' alleged violation of § 2805(f)(1) does not constitute a nonrenewal of the parties' franchise relationship within the meaning of the PMPA. We, therefore, AFFIRM the district court's judgment granting the defendants summary judgment of Dersch's PMPA claim and denying Dersch's motion for summary judgment, as well as the court's order denying Dersch's motion to alter or amend its judgment, for the reasons stated in this opinion.

CUDAHY, *Circuit Judge*, dissenting.

I.

The question that remains after studying the opinion of the district court and that of the majority (which affirms the district court by applying a different analysis) is obvious: what possible purpose could Congress have had in amending the PMPA in 1994 to add § 2805(f)(1)? Although

the district court set out to provide some sort of substance for this admittedly remedial piece of federal legislation, its efforts were, in the end, about as fruitless as those of the majority, which virtually writes § 2805(f)(1) out of the United States Code. The majority can only speculate that the section was intended to give some unspecified heft to some unspecified state remedy—thereby completely departing from the broader aim of remedying gross disparities in franchisor-franchisee bargaining power and providing regulatory uniformity on a national basis. *See Beachler v. Amoco Oil Co.,* 112 F.3d 902, 904 (7th Cir. 1997). The only state law claim mentioned is economic duress—a notably slippery cause of action even if marginally fortified by § 2805(f)(1). Maj. Op. at 27. The majority is quite frank in conceding that in its view a federal claim under § 2805(f)(1) can be recognized only if the franchisee is willing to commit economic suicide by allowing its gasoline supply to be terminated.

## A.

The district court attempted to avoid such a harsh result by tentatively allowing recovery on a theory of constructive nonrenewal. Such a theory has been clearly recognized in some circuits, *see, e.g., Pro Sales, Inc. v. Texaco, USA*, 792 F.2d 1394, 1399 (9th Cir. 1986) ("[A] franchisee who signs a successor contract under protest and promptly seeks to invoke its rights under the PMPA . . . has not 'renewed' the franchise relationship so as to bar relief under the PMPA."), and finds support in dicta in the Seventh Circuit, *see Boyers v. Texaco Refining & Marketing, Inc.*, 848 F.2d 809, 813 n.4 (7th Cir. 1988) ("Our decision that Boyers has waived his right to raise the 'constructive nonrenewal' argument on appeal should not affect his ability to pursue this theory on his main claim if the facts supporting this theory are laid out sufficiently in Boyers's Second

Amended Complaint."). This theory treats a renewal achieved by threats of termination in the same way as a literal nonrenewal. However, in exploring this promising approach, the district court was led astray into treating § 2805(f)(1) as applicable only to prospective contract provisions and not to those provisions contained in earlier franchise agreements. Thus, the district court's constructive nonrenewal analysis, although initially encouraging, is almost as thorough in erasing § 2805(f)(1) from the federal code as is the route taken by the majority.

The majority opinion, even though it rejects the constructive nonrenewal approach, disapproves of the analysis applied by the district court in draining § 2805(f)(l) of substance after that court has applied a constructive nonrenewal theory. The majority "agree[s] with Dersch's arguments in some respects" that the district court's application of the constructive nonrenewal theory " 'kept it from giving any consideration whatsoever to the substantive requirements of Section 2805(f)(l)' " and "permits 'franchisors to continue to insist upon the waiver or release of rights, if they have historically done so.' " Maj. Op. at 20-21 (quoting Appellant's Br. at 14, 20, 21). In other words, the district court erred in holding that only *new* provisions of a franchise agreement could invoke the prohibition of § 2805(f)(l). The majority goes on to say:

> [W]e think that the meaning of § 2805(f)(l)'s text is clear; a franchisor may not condition the renewal of a franchise relationship on a franchisee releasing or waiving rights under federal or state law. As such, a franchisor cannot circumvent § 2805(f)(l)'s release and waiver prohibition by offering to renew the parties' franchise relationship on terms and conditions identical to those contained in a prior franchise agreement, whether the prior agreement was entered into before or

> after enactment of the statute. Nor is a franchisor permitted to use § 2802(b)(3)(A) [the good faith proviso] to do an end run around § 2805(f)(l)'s release and waiver prohibition.

Maj. Op. at 21.

I could not agree more fully with these observations of the majority that reject the district court's application of § 2805(f)(1)'s prohibition only to *new* contract terms and that court's invocation of the good faith justification of § 2802(b)(3)(A) to validate the Disputed Provisions that have been contained in past agreements. As a matter of law, terms that violate § 2805(f)(1) cannot qualify as good faith proposals. How can one in good faith insist on the inclusion in the agreement of terms forbidden by statute? *See, e.g., Coast Village, Inc. v. Equilon Enterprises, LLC*, 163 F. Supp. 2d 1136, 1178 (C.D. Cal. 2001) ("Notwithstanding Plaintiffs' failure to rebut the evidence presented by Defendant of its good faith development of the provisions in the new agreement(s) . . . several provisions of the new agreement(s) require waiver of rights protected by state or federal law, and therefore agreement thereto cannot be required to effect renewal of Plaintiffs' franchises."); *Riverdale Enterprises, Inc. v. Shell Oil Co.*, 41 F. Supp. 2d 56, 67 (D. Mass. 1999).

To confine the prohibition of § 2805(f)(1) to *new* terms, or only to *changes* in terms, is a construction that simply finds no support in the text of § 2805(f)(1). See Maj. Op. at 21. And to rely on § 2802(b)(3)(A), which permits franchisors to nonrenew a franchise agreement relationship if the franchisee refuses to agree to changes and additions made in good faith in the normal course of business, is to indulge the contradiction that *unlawful terms* can somehow be offered in good faith and in the normal course of business.

*See Coast Village, Inc.*, 163 F. Supp. 2d at 1178; *Riverdale Enterprises, Inc.*, 41 F. Supp. 2d at 67.

Therefore, while I agree with the district court in following *Pro Sales, Inc., supra*, to find a basis for this lawsuit through a constructive nonrenewal analysis, I cannot agree that that approach can be thwarted, as it was by the district court, by restricting it only to new terms or to changes in terms, or by employing the good faith proviso to trump § 2805(f)(1). I would pursue, as a preferred option, a constructive nonrenewal analysis, but in that context would apply § 2805(f)(1) to the Disputed Provisions here even though they have been included in past agreements. Further, I would not permit § 2802(b)(3)(A) [the good faith proviso] to override the prohibition of § 2805(f)(1).

## B.

The points which the majority attempted to make in its first response[1] to the observations of the dissent are remarkable, but far from convincing. Citing the provisions of the PMPA for 90 days' formal notice of nonrenewal, together with the associated provisions for preliminary injunctive relief, the majority has contradicted most of what it carefully attempted to demonstrate in the earlier

---

[1] The reader, seeing the majority opinion and dissent simultaneously as parts of a single text, may find the interplay of the various arguments and counter-arguments both muddled and contradictory, since they have been composed progressively, one after another, and are found in layers like the sedimentary strata of the fossil record. I have tried to provide some sense of where in the temporal evolution of this dissent particular comments belong, but I recognize the extreme difficulty of keeping things in coherent order.

part of its opinion. Thus, the majority has gone to great lengths to establish that there can be no federal claim based on § 2805(f)(l) unless there has been an *actual* termination or nonrenewal of a franchise. The majority says that, "if a franchise impermissively conditions the renewal of a franchise relationship on the franchisee releasing or waiving federal or state law rights, *and the franchisee's refusal to agree to this conditional renewal results in the nonrenewal of that relationship*, the franchisor's violation of § 2805(f)(l) may be examined in conjunction with the franchisee's claim for the nonrenewal of its franchise relationship." Maj. Op. at 27-28 (emphasis added). Nothing could be clearer than this. And, of course, it is the basis of my observation, to which the majority now objects, that the franchisee must either waive its rights under § 2805(f)(l) or commit economic suicide by allowing its gasoline supply to be cut (through nonrenewal of the franchise).

The majority, also in its first response to my dissent, points to provisions for a notice of nonrenewal and for associated *preliminary* injunctive relief as affording an escape from the "Catch-22" which I have outlined. 15 U.S.C. § 2805(b)(2). In effect, the majority is saying that, in a § 2805(f)(1) case like the one before us, the statutory *notice* of nonrenewal is the precise equivalent of nonrenewal itself and may be treated as nonrenewal for purposes of maintaining suit. This position, of course, recognizes the validity of constructive nonrenewal, a concept that the majority opinion has otherwise attempted thoroughly to demolish. Constructive nonrenewal merely means treating something which is literally or in fact *not* nonrenewal as actual nonrenewal for purposes of litigation. A substantial part of the majority opinion is dedicated to showing the error of con-

structive nonrenewal,[2] yet, in response to the dissent, the majority argues that the statutory notice of nonrenewal really amounts to actual nonrenewal for purposes of sustaining a lawsuit based on § 2805(f)(1). This is a convenient contradiction that simply will not hold water.[3] The majority

---

[2] Thus, the majority states, "When a franchisor's violation of § 2805(f)(1) does not result in a nonrenewal of the parties' franchise relationship, a franchisee must resort to remedies outside of the PMPA to vindicate its rights under the statute." Maj. Op. at 24.

[3] Now, I look at what I hope (as I compose this chronologically-last footnote) is the final version of the majority and dissenting opinions. I see that in the course of numerous passages back and forth of drafts of these opinions between the majority and me (and the revisions consequent to these passages) the majority opinion seems to have evolved from emphatic disapproval of a theory of constructive nonrenewal to an embrace of that approach. The majority in effect now says that Dersch made only a procedural error. Had this small gasoline distributor merely waited for a formal notice of termination instead of signing the franchise agreement under protest, he would have been free to litigate his rights under § 2805(f)(l) to his heart's content.

This is a procedural possibility not mentioned by either of the parties or by the district court nor, as far as I am aware, by anyone else in connection with the enforcement of rights under § 2805(f)(l). I am not prepared to say that constructive nonrenewal as outlined by the majority does not exist, but the majority's route is certainly not expressly provided in the words of the statute. There is nothing to indicate a preference by Congress for the solution proposed by the majority to the path outlined in *Pro Sales* and open to Dersch here.

However, the important thing to me is not the procedural formalities (not) observed by Dersch, but rather the possibility of
                                                                   (continued...)

also asserts that the standards for *preliminary* relief under the PMPA are lenient in their demands on the franchisee. They can hardly be lenient enough to provide preliminary relief when by the majority's analysis elsewhere there can be no permanent relief under § 2805 (f)(l)—injunctive, declaratory or in damages—unless there has been an actual nonrenewal of the franchise.[4] And, if suit may be main-

---

[3] (...continued)
maintaining suit without suffering a loss of fuel supply. My position here is that Dersch should not be deprived of this opportunity in the case before us, whether or not there was some other procedure that might have provided a similar opportunity. As I have noted, the procedure proposed by the majority is far from clear from the text of the statute and seems to me in no way superior to the *Pro Sales* approach.

Nonetheless, I am pleased that this dissent has apparently resulted in the concession that constructive nonrenewal is alive and well—albeit in a slightly different form than that pursued by Dersch and Pro Sales. How these developments will be viewed by the franchisor community remains to be seen. In the responses of the majority to this dissent, franchisors may have won the battle but lost the war.

[4] See Maj. Op. at 15 ("In order to prevail, the franchisee must prove, as a threshold matter, a . . . nonrenewal of its franchise."); Maj. Op. at 27 ("We, therefore, conclude that if a . . . coerced relinquishment of [a federal or state] right does not result in a nonrenewal of the parties' franchise relationship, the franchisee must resort to remedies outside the PMPA context to enforce § 2805(f)(1)'s release and waiver prohibition."); Maj. Op. at 27-28 ("[I]f a franchisor impermissibly conditions the renewal of a franchise relationship on the franchisee releasing or waiving federal or state law rights, and the franchisee's refusal to agree to this conditional renewal results in the nonrenewal of that rela-
(continued...)

tained by treating notice of nonrenewal as the functional equivalent of nonrenewal itself, what need would there be for something formally titled "a private right of action"? In fact, if the majority's view of the 90-day notice provision is correct, the majority is recognizing a procedure which in every relevant respect is functionally equivalent to a private right of action for the franchisee.

Additionally, the only case from this circuit, *Beachler*, cited to support the majority's contention that Dersch should have refused to sign the renewal agreement and filed suit upon receiving statutory notice of nonrenewal does not stand for the proposition that PMPA relief requires such formal notice under § 2804. *Beachler*, 112 F.3d 902. If anything, *Beachler* supports the proposition that Dersch's PMPA cause of action arose the moment Shell said "take-it-or-leave-it," and was unaffected by whether or not Dersch signed under protest. In *Beachler* we analyzed the availability of relief for franchisees under the PMPA *without regard to whether formal notice of nonrenewal or termination under § 2804 was ever issued.* See *id.* at 903-04 ("Once Amoco's plans for the assignments and sales were finalized, affected dealers in Peoria and Springfield were notified both orally and in writing. Six of the sixteen dealers then instituted this action under the PMPA for preliminary and permanent injunctive relief."). The franchisees in *Beachler* filed suit upon written notice of the pending assignment and were denied relief because "the franchisees" have failed to show that the assignments *would give rise* to a termination or nonrenewal under the PMPA." *Id.* at

---

[4]  (...continued)

tionship, the franchisor's violation of § 2805(f)(1) may be examined in conjunction with the franchisee's claim for the nonrenewal of its franchise relationship.").

909 (emphasis added). What is significant is that the right to relief under the PMPA did not depend upon either of the grounds advanced by the majority: (1) actual nonrenewal or termination or (2) formal notice of nonrenewal under § 2804(a).[5] Therefore, as I have already argued, Dersch's cause of action for constructive nonrenewal, as analyzed under *Beachler*, arose when Shell made its take-it-or-leave-it

---

[5] The majority's responses to my dissent appear to recognize subliminally that it is on perilous ground with its newly conceived acknowledgment that actual nonrenewal is not a precondition to PMPA relief. Because the statute does not expressly require statutory notice as a precondition to the preliminary relief cited by the majority (it merely requires the still indeterminate concept of "nonrenewal" contained in § 2805(b)(2)(A)(i)), the natural next question is why must we adopt the majority's requirement of formal statutory notice? The majority answers that question by citing to the district court of the Southern District of Texas for its proposition that the absolute earliest moment at which PMPA relief is available is at the time formal statutory notice is given under § 2804(a). *Shell v. Shell Oil Co.*, 216 F. Supp. 2d 634 (S.D. Tex. 2002). However, the majority fails to indicate how, within this analytical framework, *Beachler's* plaintiffs could have, any more than Dersch, had a cause of action for nonrenewal based on Amoco having "announced its intention[s]"; a circumstance that, like the take-it-or-leave-it offer given Dersch, evidences a total lack of formal statutory notice of nonrenewal. *Beachler*, 112 F.3d at 902. Texas' admittedly extensive understanding of all things petroleum notwithstanding, *Beachler* is good law in this circuit and is extensively relied upon by the majority for its test of "nonrenewal," and *Beachler* clearly does not require formal statutory notice of nonrenewal as a prerequisite to "nonrenewal."

offer of renewal[6] containing the contract terms that violated § 2805(f)(1).[7]

The majority's observations about *Pro Sales* and its relation to Dersch's claim are equally wide of the mark. First, the majority faults Dersch for failing to "promptly seek to invoke its rights under the PMPA." "Promptly" in the case of *Pro Sales*, by the majority's reckoning, apparently meant in a matter of days or weeks, not a year as in Dersch's case. However, I think this *Pro Sales* requirement relates significantly to the kind of relief being sought. In *Pro Sales* the franchisee apparently asked for injunctive relief. Dersch requests only declaratory relief (which I suppose might translate into reformation of the franchise agreement) and there is no particular need for a speedy resolution in that context or, for that matter, a need to

---

[6] Subsequent revisions of the majority opinion appear to indicate that it might, perhaps, agree with the statement in the text when it lowers its requirement for a nonrenewal suit to simply a "formal[ ] express[ion]" of an intent to nonrenew. Maj. Op. at 35-36 n.20. This immediately brings to the forefront what is perhaps the true kernel of my disagreement with the majority: how and why is Dersch's cause of action under the PMPA extinguished by its agreement under protest (ostensibly to preserve its rights under the PMPA) to the unlawful conditions that are the trigger of those very rights? In the interest of bringing this dissent to a final close, I leave that question for future discussion and possible resolution.

[7] The ultimate holding of *Beachler*, that there was no nonrenewal, does not undermine this analysis. That holding resulted from an examination of whether the prospective effect of the announced assignment would be nonrenewal. Similarly, Dersch's case should be analyzed to determine if the prospective effect of the take-it-or-leave-it offer would be nonrenewal, which, as noted *supra*, I believe it would be.

maintain the old contract in force pending a declaration of its illegality (and the excision of its void provisions). Further, the statutory language of which the majority is so fond defines for us what is considered "promptly" done under the PMPA: filing suit within one year of the non-renewal. § 2805(a). The majority cannot be claiming that Dersch sat on its rights without notice to Shell: Dersch signed under protest after clearly indicating its lack of assent to the contract terms. There is no question that Dersch has acted as "promptly" as the PMPA requires.

The majority also faults the *Pro Sales* court for ignoring the PMPA provisions for receipt of the formal notice of termination and immediate recourse to preliminary in-junctive relief. I fail to see the relevance of this point. The fundamental analysis of the basic merits of rights under the PMPA by the Ninth Circuit is quite different from the analysis by the majority here. Whether the *Pro Sales* court thought the PMPA provisions for notice and preliminary relief were important, let alone critical, does not seem to me significant in the context of its basic approach. After all, preliminary, status-quo-maintaining procedures are purely ancillary to statutory rights. They may afford a more orderly mode for enforcing rights, but they are hardly central to the analysis. Nor does § 2805(b)(2) significantly alter the balance of bargaining power as between franchisor and franchisee.

## II.

### A.

As an alternative approach, I believe that an independent basis for plaintiff's suit might be found even without re-course to the theory of constructive nonrenewal (although an independent basis is not necessary to the result here). Both the majority and the district court here rejected the

possibility of a private right of action for franchisees injured by breaches of § 2805(f)(1). Both the district court and the majority relied heavily on *Alexander v. Sandoval*, 532 U.S. 275 (2001), in reaching this conclusion. I certainly have no quarrel with the thesis that the existence of a private right is a matter of Congressional intent. But *Sandoval*, which involved an alleged private right to sue on regulations that extended the rights conferred by the statute, is a far cry from the present case, which deals with a new statutory right that is an awkward fit in the express enforcement provision already contained in the statute. This is not, as the majority characterizes it, an attempt to read new types or modes of remedies into the statute. *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19-20 (1979). Section 2805 clearly provides for damages as well as injunctive relief. Nor is this an attempt to expand an existing cause of action to capture new, extrastatutory conduct. *Sandoval*, 532 U.S. 275. An unarguable purpose of the statute is to furnish private rights to franchisees to protect themselves from franchisors who use imbalances in bargaining power to force compliance with franchisor policies. *Beachler*, 112 F.3d at 904. And this certainly is not an attempt to hijack a funding statute whose purpose and function lie far removed from private citizen actions. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 122 S. Ct. 2268, 2275-76 (2002).

The cases upon which the majority relies forbid the distortion of statutory language to create remedies where none were intended. These cases are distinguishable from the present case, where Congress's clear intent was to empower private actors, the franchisees, with a cause of action. While the original statute defined those rights in terms of literal nonrenewal or termination, the 1994 amendments expanded that right in § 2805(f)(1) to include renewal accomplished at economic gunpoint, where the *threat* of nonrenewal forced waivers of rights otherwise

provided by law. To see the statute in its totality and con-
clude that Congress's arrangement shows an intent not to
allow a remedy for this right defies the logic of the statute.
Section 2805(f)(1) becomes a dead letter unless Dersch has
a basis for maintaining this kind of suit, and the class of
persons entitled to sue will not be enlarged by recognizing
a private right here. In summary, Dersch has a basis for suit
preferably as a matter of constructive nonrenewal or,
as an alternative, by exercising a private right of action
under § 2805(f)(1).

## B.

Once it is determined that Dersch has the ability, as a
threshold matter, to maintain an action under the PMPA,
via one or the other statutory alternative, one must next
decide whether, on the merits, the Disputed Provisions
here violate § 2805(f)(1) and actually require the waiver of
a right existing under state law as a condition of the fran-
chise renewal. As the majority makes clear, the franchise
renewal here was offered on a take-it-or-leave-it basis.
Therefore, if the Disputed Provisions required Dersch to
waive a state law right, § 2805(f)(1) was violated.

The first Disputed Provision is Article 5, which allows
the defendant to make alterations in the conditions and
locations of fuel deliveries. Dersch alleges that Indiana law
gives it the right to a franchise agreement that does not
contain provisions allowing the substantial modification of
the agreement without the written consent of Dersch.[8] The
district court did not consider the merits of Dersch's Article

---

[8] The state law sections relevant to the Disputed Provisions are
set forth in the majority opinion, *supra*, at 6 nn.4-5.

5 claim, finding instead that Dersch had failed to show that a constructive nonrenewal took place. While I am inclined to believe that the effect of Article 5 is to allow a "substantial modification of the franchise agreement" without written consent of Dersch, there has been insufficient factual development to determine whether, in fact, Dersch qualifies for the protection of Indiana's Deceptive Franchise Practices Act, Ind. Code §§ 23-2-2.7-1 et seq. I would remand to the district court to determine whether Article 5 violates § 2805(f)(1).

Dersch also argues that Disputed Provision Article 11, in which Dersch agrees to indemnify Shell even for actions in which Shell was contributorily negligent, violates Illinois law establishing the right to several liability for defendants whose fault is found to be less than 25% of the total fault, and establishing Dersch's right to contribution from joint tortfeasors. See 735 ILCS § 5/2-1117; 740 ILCS § 100/2. Dersch's argument appears to have merit. Section 2-1117 would assign liability to Dersch, in admittedly limited circumstances, only to the extent of actual pro rata fault. Additionally, the invoked right to contribution under 740 ILCS § 100/2 (that was, for unknown reasons, not expressly listed by statutory section) gives Dersch the right under Illinois law to escape liability for Shell's tortious conduct. Article 11 requires Dersch to waive this right, and appears, therefore, to violate § 2805(f)(1). However, on remand, I would allow Shell to show any circumstances that might undermine Dersch's argument on this point. The issue has not been addressed on the merits by either the district court or the majority.

On another of the Disputed Provisions, I agree with the district court that Dersch's claim under Articles 21.2 and 21.3 of the Agreement cannot succeed. Article 21.2 is inapplicable to Dersch because Dersch is not "composed of

more than one person." Article 21.3, Dersch argues, is designed to require by contract that managers and directors of Dersch assume personally the obligations of the corporation. Although I perceive how Dersch could arrive at its interpretation of the unusual language of Article 21.3, I cannot assign such sweeping legal consequences to this provision taken as a whole. I do not see how the managers and directors, who are not parties to the franchise agreement, could be assigned personal obligations under it by the parties. Overcoming the right of a third party not to be bound by a contract to which she is not a party would require the third party's consent. Even if Article 21.3 were an attempt by Shell to impose contractual obligations on nonparties, and this is hinted at by the unusual language, this is simply not a legal possibility.

On a broader front, Shell asserts that the savings clause of Article 19 eliminates any alleged violation of law supporting Dersch's action. Article 19 of the Agreement states:

> To the extent that any provision of this Contract is in conflict with any valid and enforceable law existing on the effective date thereof, that provision shall be deemed amended to conform with such law as it applies to this Contract at the time either party takes any action or exercises or claims any rights under such provision.

This provision, which presents the most difficult issue in the case, may well have been designed by Shell to avoid the sort of confrontation with franchisees with which we are struggling. If so, the effort almost succeeds, but in the end seems to deal more with appearances than with reality. Shell can argue, in accordance with the language of Article 19, that the Disputed Provisions are only enforceable to the extent permitted by law. Hence, none of the Disputed Provisions can violate § 2805(f)(1) because they would at

some point be amended by Article 19 to conform to the PMPA's strictures. This has a good ring to it, but there may be serious questions of timing. While the savings clause may operate at some future date to amend the invalid provisions, it does so after the violation of § 2805(f)(1) giving rise to the claim has occurred.

The plain language of § 2805(f)(1) forbids the waiving of state law rights as a condition of *entering into* a franchise agreement. Therefore, the § 2805(f)(1) violation occurs with the franchisor's *threat* of nonrenewal by a take-it-or-leave-it contract containing a term that waives a franchisee's state or federal legal rights. *Accord Pro Sales, Inc.*, 792 F.2d at 1399; *Coast Village, Inc.*, 163 F. Supp. 2d at 1176 ("Franchisees facing an immediate threat of nonrenewal may sue under the PMPA."). Article 19 amends contract provisions that have been determined to violate a valid law. Therefore, even assuming Article 19 operates as Shell argues and would eventually amend a contract term found to violate § 2805(f)(1) retroactively to the date the contract went into effect,[9] Article 19 cannot operate to undo the antecedent

---

[9] This is an assumption, the validity of which is not clear. First, it is not clear that a contract provision in itself actually violates § 2805(f)(1). The language speaks of the conduct of the franchisor in requiring a state or federal law waiver, not of the invalidity of the provision itself. As other courts have held, requesting a waiver of a franchisee's legal rights is not, per se, illegal. It is only when that waiver is part of a take-it-or-leave-it contract, and there are threats of nonrenewal if not accepted, that § 2805(f)(1) is violated. *See Coast Village, Inc.*, 163 F. Supp. 2d at 1181 n. 38, 39 (collecting cases). Therefore, unless the waiver standing alone is per se illegal, Article 19 might not ever take effect.

(continued...)

threat. And it is the threat of nonrenewal to induce accep-
tance of renewal terms violating § 2805(f)(1) that forms the
basis of the claim.

Would a lawyer advise her franchisee-client to submit to
terms abrogating the client's state law rights in the hope
that the contract would somehow be amended to conform
to state law in the future? This seems to me to be the
practical context in which to view the problem.

---

[9] (...continued)

Second, the effect of Article 19 in this context may, in some
sense, be illusory. A franchisee faced with a take-it-or-leave-it
contract containing provisions objectionable under § 2805(f)(1)
cannot negotiate those terms, as the phrase "take-it-or-leave-it"
makes clear. After the contract becomes effective, Shell is not
simply going to remove those terms upon the objection of a
franchisee that § 2805(f)(1) has been violated (especially under the
majority's view eviscerating such a franchisee's PMPA rights).
Instead, at that point, litigation will commence. Only after a court
has ruled that § 2805(f)(1) has been violated would Article 19
possibly effect an amendment of the offending provision, thereby
merely duplicating, in part, what the court's ruling has already
done. From this perspective, Article 19 is mere surplusage to the
PMPA remedies. Although likely well-intentioned, enforcement
of Article 19 might be as difficult and costly as enforcement of
rights under the PMPA.

This is not to say Article 19 lacks any valid purpose. If Shell
were to pursue a breach of contract action against a franchisee,
the franchisee might defend by claiming the contract is void for
illegality of certain provisions. Article 19 might operate in such
circumstances to amend the offending contract provisions and
allow the primary claim, breach of contract, to proceed on the
merits. That curative use of Article 19 is starkly different from the
nullifying use being advocated by Shell in this case.

### III.

I would, therefore, reverse and remand to the district court for further proceedings, and I respectfully DISSENT.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*